## PALMER vs. CLARKE & WIFE.

1. B. made a deed of gift to a grandchild of a negro girl that belonged at the time to himself, and subsequently sold and delivered the negro to one C., who bought with notice of the voluntary deed. The negro, many years afterwards, was found in the possession of one P., who purchased and held under G. On the trial of a suit, brought by the grandchild and her husband against P., there being no evidence to show that G. derived his title either from C., or the donee. *Held*, that P.'s title was not protected against the voluntary deed, by the fact that he purchased without notice—that this rule only applies, when both parties derive title from the same person.

2. A new trial will not be granted when the verdict can be supported by the evidence.

Trover, in Haralson Superior Court. Tried before Judge HAMMOND, at the October adjourned Term, 1859, and motion for new trial decided by Judge RICE.

This was an action, brought by Thomas Clark and his wife, Rebecca Clark, against George H. Palmer, to recover damages for the alleged conversion of a negro girl slave, by the name of Mary, but sometimes called Emeline, eighteen years old at the time said suit was commenced—in October, 1848—alleged to be worth one thousand dollars, and to be of the yearly value for hire of fifty dollars.

On the trial of said case, the plaintiffs introduced the following testimony, to wit:

An original deed of gift from John Baird to Rebecca Baird, for a negro girl, by the name of Mary, dated in 1833.

The record of the marriage license and return, showing the intermarriage of Thomas Clark and Rebecca Baird, on the 13th of June, 1847.

An exemplified copy of the record of the Court of Ordinary of Franklin county, showing the appointment of John Baird, as guardian of Rebecca Baird, in 1828, and his dismissal, on the 5th of December, 1836.

John Clark, testified: That, in the fall of 1833, in Franklin county, John Baird made a deed of gift to Rebecca Baird, then, but now Rebecca Clark, conveying a negro girl, then about three years old, of dark complexion, and by the name of Mary; that witness had married the daughter of John Baird and mother of Rebecca Baird; that John Baird

delivered the deed of gift to the witness, who had it recorded that John Baird called up Rebecca, and said: "There is your negro, I now deliver her to you;" that the negro remained in John Baird's possession until the latter part of the year 1836, when she was missing; that witness heard of her no more until in the year 1847; that Rebecca went home and lived with witness and her mother, until 1847, when she intermarried with Thomas Clark, being then about twenty years old; that witness never saw the negro from the time she was missing until the 7th of August, 1848; that, at that time, he went to defendant's house and found the negro, who was then called Emeline; that, at that time, the negro was worth eight hundred dollars, and, although he has not seen her since, he believes her now to be worth twelve hundred dollars; and that she was worth for hire seventy-five dollars per year; that the plaintiff, Thomas Clark, on that day—the 7th of August, 1848—demanded the possession of said negro from the defendant, who refused to give her up; that in 1848, defendant told witness, the negro was a good conditioned negro, and a good field hand, and a good house hand, and from what defendant told witness, he, then, believed her worth eight hundred dollars, and if she is as good as defendant said she was, she is now worth twelve hunred dollars, and for hire an average of seventy-five dollars a year; that, in 1837, Wiley Clark acted as the guardian of Rebecca; that John Lackey told witness, in 1848, that he had notice of the deed of gift when he bought the negro, and that defendant told witness, that, when Goodwin sold the negro to him, he said there was an incumbrance against her, but it was cleared up, or nearly so; that witness is acting as agent for plaintiffs, but has no interest in the suit.

John B. Word testified: That he witnessed the deed of gift read in evidence; that he knew the negro girl in dispute; that in Christmas holidays, in 1836, he saw her concealed upstairs in the house of Benjamin Cleveland, who offered to sell her to witness for a piece of land and one hundred and fifty dollars, provided the witness would run her to Mississippi and alter her name, to which witness replied: he would not cheat that worse than orphan child out of that negro for every one Clevland had; that he had a conversation with defendant about the time this suit was commenced, and de-

fendant said he had heard of some difficulty about the title to the negro, but he understood it to be a judgment or execution; that Cleveland is witness' uncle.

Ann Clark testified: That she saw the deed of gift executed, and the negro delivered, but the negro remained in Baird's possession, because, as Baird said, he was Rebecca's guardian, and he was afraid John Clark would charge Rebecca for raising the negro; that Baird was solvent at the date of the deed of gift, and told witness that the negro was stolen at the time she was missing.

The plaintiffs having closed their testimony, the defendant introduced the following testimony, to wit:

John Baird and William Baird, testified: That the negro girl in dispute was sold to Benjamin Cleveland for a valuable consideration, by John Baird, and a bill of sale executed, and it, together with the negro, was delivered to him. W. W. Baird thinks Cleveland knew of plaintiff's claim; that the negro was not sold to Cleveland secretly, but openly, and the purchase price was paid by Cleveland.

The defendant also proved that the negro girl was sold by one Garner to Lackey, and by Lackey to Goodwyn, and by Goodwyn to the defendant.

There was some evidence of conversations between these different owners about incumbrances, judgment, and mortgages against the negro, but nothing was ever said amongst them about the deed of gift on which the plaintiff's title rests, and the proof showed that, when Palmer bought from Goodwyn, he was told by Goodwyn that the incumbrance was lifted and that said incumbrance was a mortgage or lien to a man named Stone, of Tennessee.

David Robertson, testified: That he was acquainted with the negro girl; that she looks badly, and has long and frequent laying-up spells; that she is not, under present circumstances, and as she is, worth more than three hundred dollars; that, some years, her hire would be worth thirty or forty dollars, and in others, her hire would be worth nothing, but that she would be an expense and charge; that twenty-five dollars a year would be a high average hire for her; that she never brought but one child, which died in a day or two after its birth; never saw her doing any hard work; she is not a good field hand; never saw her splitting rails; has

seen her plough and wash sometimes; her complexion is swarthy; defendant and witness married sisters.

George Wagnon, testified: That he had known the negro in dispute from the time the defendant bought her; her complexion is swarthy, and she looks badly; she is sometimes up and sometimes down; witness is frequently at defendant's house; defendant feeds and clothes his negroes well; the girl is, perhaps, worth four hundred and fifty dollars, but from her present condition and circumstances, the witness does not consider her services worth anything.

Defendant also introduced a bill of sale, executed and recorded, dated the 2d of June, 1850, made by John Goodwyn to him for said negro, at the price of four hundred and fifty dollars.

The jury returned a verdict for the plaintiffs for the sum of one thousand dollars, to be discharged by returning the negro in twenty days, and the further sum of fourteen hundred and fifty-eight dollars and thirty-three cents for the hire of the negro, with cost of suit.

Counsel for defendant then moved for a new trial in said case, on the following grounds, to wit:

1. Because the jury found contrary to law.

2. Because the jury found contrary to evidence, and the weight of evidence.

3. Because the damages found by the jury are excessive.

The presiding judge granted the *rule nisi* for a new trial, and the same was, by the consent of the parties, heard before His Honor, George D. Rice, at chambers, at Marietta, Georgia, on the 21st of June, 1860, and upon the hearing, the said judge passed the following order to wit:

"Upon hearing the argument upon this rule, it is ordered that said rule be overruled on all the grounds taken, except the third ground, and overruled on that ground, provided the plaintiffs will, and do write off, and remit all the damages for the hire of the negro, except one thousand dollars, and if such damages are not remitted, it is ordered by the Court that the verdict be set aside, and a new trial be awarded on the said third ground taken in the rule."

This decision is the error complained of in this case.

KNIGHT, CHISOLM & WADDELL, and IRWIN & LESTER, for the plaintiff in error.

BUCHANAN, for the defendants in error.

*By the Court.*—LYON, J., delivering the opinion.

The only ground relied on for a new trial is, that the verdict is contrary to the evidence. Counsel, in the argument, insisting—

First. That the plaintiff in error, Palmer, is an innocent purchaser of the negro that forms the subject of controversy, without notice of the outstanding voluntary title under which defendants in error claim.

Second. That the damages, or amount of the finding, both as to the value of the negro and the hire, are excessive.

1. We do not think that the plaintiff in error, under the facts of this case, is an innocent purchaser, without notice; or in a position to be entitled to the benefit of the rule. Cleveland, who bought the negro from Baird, the donor, under whom the defendants claim, evidently bought with notice of this voluntary title. In a very few days after his purchase, he had the negro, then a little girl, concealed at his house, offered to sell her to his nephew at a very small price, provided she should be run off and her name changed. His nephew, indignantly, refused and gave as his reason that he would not wrong this worse than orphan—Mrs. Clark, then an infant and now one of the defendants in error—for all that he, Cleveland, was worth. If Cleveland bought in good faith, and without notice, why this concealment? Why run off and change the name of the negro? Besides this, Cleveland was himself a witness on the trial. This was an important fact to be proven for the defence. If it was true that he bought without notice, he would have testified to the fact, but he does not. Both the Bairds testify, that they thought he, Cleveland, had notice of the title when he bought. All these facts, taken together, are sufficient to justify the conclusion that Cleveland bought with notice. Here, the whole inquiry ends; because no title was shown ever to have passed out of Cleveland for the negro. The first that we hear of her, after the interview between Cleveland and his nephew, she is in the possession of one Garner, but how she got there, or in what right he held her, does not appear. From Garner she is passed through the hands of different persons, by sale and delivery, down to the plaintiff in error. Now, although

the plaintiff may have purchased in good faith, without notice, in fact, that there was anything against the title he was buying, still, as the title which he got was not connected with the original donor, and did not emanate from the same person that the voluntary deed did, under which defendants claim, and came down to him by a regularly connected chain of purchases and sales, he is not a *bona fide* purchaser · without notice within the meaning of the rule, so as to be protected against that title. If the plaintiff's title had been connected with Cleveland, and either he or any of those under whom he held had bought without notice of this title, the defendant's title would have been defeated. As it was not connected, he can· not claim the benefit of the rule. The true title to the· negro was in Baird, and by him was conveyed to Mrs. Clark, one of the defendants, by the voluntary deed. The subsequent conveyances by Baird to Cleveland did not affect that title, by reason of Cleveland's notice of that deed. Garner, under whom defendants hold, claims under neither the one or the other, but as to either, his holding was tortious. The plaintiff has, by his purchase, no better title than Garner had, and the fact that he bought without notice, no more makes his title good than if Garner had stolen the negro either from Mrs. Clark or Clevland.

Then, are the damages excessive? We think not. The plaintiff here can not complain as to the value that the jury placed on the negro—one thousand dollars. For, if she was not·worth so much, he ought to have given her up in satisfaction of the same, as by the verdict he was authorized to do. That he preferred to keep the negro is pretty strong evidence that he did not regard this amount an exorbitant estimate.

2. There is more difficulty as to the amount allowed for hire, but, under the evidence, we do not think the amount, to which the finding was scaled by the Court in its judgment on the motion for a new trial, is excessive. The plaintiff has had this negro for nearly twenty years, and·she was all the time worth something. One witness says twenty-five dollars, another, one hundred dollars per year. If fifty dollars a year be allowed, and that is quite small, and interest added to each year's hire, as it fell due up to the time of the finding, and we do not see why it should not be, as it is a part of what defendants were entitled to, or would have received

but for the conversion, the finding would have been much larger than that allowed. So, on the whole, we can see no good reason for disturbing the judgment of the Court below.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be affirmed.